BROADWAY-BROMPTON BUILDINGS LIQUIDATION TRUST, AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 82818. Promulgated October 13, 1936.

*Harry B. Sutter, Esq.*, and *Peter L. Wentz, Esq.*, for the petitioner.
*S. L. Young, Esq.*, for the respondent.

### OPINION.

VAN FOSSAN: This proceeding was brought to redetermine a deficiency in the income tax of the petitioner for the fiscal year ending August 31, 1933, in the sum of $2,305.34, together with an excess profits tax deficiency of $838.31 for the same year.

The only question at issue is whether the petitioner is taxable as an association or as a trust. Several other assignments of error were made but were withdrawn or settled by stipulation. It was further stipulated that no excess profits tax is due and that if the petitioner is taxable as a trust the correct amount of its income tax is $1,359.60.

The petitioner was created by a trust agreement dated August 15, 1932, and designated as Trust No. 1578. Its office is in Chicago. Its trustee is the American National Bank & Trust Co. of Chicago, formerly the Straus National Bank & Trust Co. of Chicago. The beneficiaries are persons who held bonds secured by two first mortgages on the properties known as the Broadway-Brompton Buildings and Broadway-Brompton Garage Annex in Chicago. Certificates of 6,970 units of beneficial interest were issued to such bondholders in uniform and direct proportion to the amount of bonds owned by each of them. The trustee continues to act under the original trust agreement, without modification, amendment or alteration.

The Broadway-Brompton Buildings consisted of two adjacent three-story store and apartment buildings, each of which contains 20 apartments and six stores. The Broadway-Brompton Garage Annex is a garage of 350-car capacity, about 200 feet by 250 feet in size and operated as a public garage. The heating plants are separate but the hot water for all the buildings is supplied from the garage boiler. The apartment buildings and garage were built by the same persons and were managed and operated as one project.

In 1927 the owners of the Broadway-Brompton Buildings placed a mortgage on the property and issued bonds in the amount of $650,000, against which, in 1930, the sum of $35,500 had been paid. In 1928 the owners of the Broadway-Brompton Garage Annex (being the same persons) placed a mortgage on that property and issued bonds in the amount of $85,000, none of which was paid. The aggregate indebtedness standing against the two properties in 1931 when acquired by the petitioner was $699,500.

All of the bonds were issued through Huszagh, Musson & Co., an old established firm dealing in real estate bonds. Two Chicago banks held a substantial amount of the bonds as collateral. Bonds in small amounts were purchased by many individuals, such as elderly persons, owners of small businesses, women, and widows who had the proceeds from life insurance policies to invest. Such bondholders considered them as "gold bonds", nonspeculative, and productive of a sure return at a fixed rate.

After default on December 15, 1930, in the payment of principal and interest on the bonds there was no market for them. Under the terms of each of the mortgages joint action of the bondholders was required to foreclose. Thereupon the bondholders under the two mortgages formed a protective committee to look after their interests and deposited with it over 99½ percent of the bonds outstanding under such mortgages. The committee attempted to make some arrangement with the owners of the buildings to protect the interests of the bondholders and to avoid a foreclosure, but was unsuccessful. The committee thereupon foreclosed, acquired title to the property, and attempted to sell it. The bondholders insisted that the assets be liquidated forthwith, if possible. The chairman of the committee demanded that some method be employed to force liquidation of the properties. Counsel for the committee assured him that the trust would accomplish such result. In order to hold the legal title until a purchaser could be found and to preserve, conserve, and manage the property in the interim the committee chose the trust agreement as the form of instrument best suited to its needs. A compulsory sale within five years was suggested but in view of the uncertain duration of the depression and the impossibility of immediate liquidation, that period was lengthened to 15 years. After the formation of petitioner the title to the properties was transferred to petitioner.

The trust agreement of August 15, 1932, relates the history of the bond issues and the conditions under which the bondholders acquired the property. It refers to an agreement of the bondholders made on January 2, 1931, and states that the purposes of that agreement were to acquire, sell, and liquidate the property and to distribute the pro-

ceeds thereof to the bondholders as soon as practicable. The trust agreement repeats that purpose as a factor in creating the trust. The essential portions of the trust agreement are as follows:

### ARTICLE I.

The name of this trust shall be the BROADWAY-BROMPTON BUILDINGS LIQUIDATION TRUST, and its object shall be the acquisition, sale and liquidation of the Trust Property and of all such other property incidental thereto as may hereafter be acquired from time to time under this trust, and the distribution of the net proceeds thereof as soon as may be practicable in the opinion of the Trust Managers, and in the meantime the conservation thereof (and to that end the management and control thereof), and the division of the net income, proceeds and avails of said Trust Property among the beneficiaries hereof, hereinafter referred to as "Certificate Holders."

It is the intention and purpose hereof that the Certificate Holders shall be trust beneficiaries only; that the Certificate Holders, the Bondholders Committee and its members, and the Trustee and the Trust Managers as herein constituted shall have no other relationship hereunder; and that there shall be no relation of or liability hereunder as partners, or any other relation or personal liability whatsoever, legal or equitable, among themselves or one with the other or any of them, or with any other person or persons, corporation or corporations; and that the Certificate Holders shall have only a beneficial interest in the net income, proceeds and avails which may come into the hands of the Trust Managers and the Trustee through sales, leases, assignments or other dispositions, conversions or uses of the Trust Property or any part or parts thereof.

### ARTICLE II.

The Trustee shall have full power to perfect and secure its right, title or interest to the Trust Property or any portion thereof and shall have the power to redeem in equity or otherwise from any sale under a decree or judgment, and to acquire title to property or any interest or right therein directly or through a nominee or otherwise, and the Trustee shall hold all of the Trust Property in trust, to sell and convert the same into cash or other real and/or personal property, and to distribute the net proceeds thereof to the beneficiaries hereunder, and in the meantime, for the purpose of the ready sale and conversion of the property and with that end always in view, it shall have full power (subject as hereinafter provided) to manage, operate, improve, protect and maintain the same; from time to time to lease and demise said Trust Property or any parts thereof, with the improvements thereon or to be erected thereon, in possession or in reversion, for any length of time (even for terms extending beyond the duration of the trust and any such term may commence either *in praesenti* or *in futuro*), and to contract to make leases and to grant options to lease and options to renew leases, and to contract respecting the manner of fixing the amount of present or future rentals, and to modify and amend all existing and/or future leases in all respects, and generally and without limitation or restriction, to lease from time to time and upon any terms and conditions whatsoever, the whole or any part or parts of the Trust Property. * * * [Here follow more specific rights and powers, all necessary and incidental to the primary purpose of liquidating the identical trust property, the Broadway-Brompton Buildings, hereinbefore described.]

The trust agreement contains no provision for continuing business but the trustee is required to distribute the proceeds of the operation and liquidation of the property. It may set up such reserves as it deems advisable.

The trust may be terminated whenever the trust managers in their sole discretion may determine, or upon the direction of two-thirds of the beneficiaries, but in any event within 15 years. The termination clause contains this statement:

* * * It being the intention, however, that the Trust property be sold and liquidated as soon after the institution of this trust as conditions may permit, and the net proceeds thereof distributed to the Certificate Holders;

The trust managers have acted principally through their managing agent, a salaried employee. The managing agent initiates negotiations relating to the business and obtains the approval of the trust managers on all major matters. They have not leased it or any parts of it, for long terms. They have not invested in securities. They have retained no depreciation reserve. They have made no additions or improvements to the property.

Since the creation of the trust the trustee and trust managers have made continuous and persistent efforts to sell the trust corpus. The property was listed with many active real estate brokers in Chicago. Detailed statements of earnings and an elaborate description of the property were given to the brokers, who were informed that the beneficiaries and the trustee were anxious to sell and would entertain any reasonable offer. The beneficiaries originally did not want to take over the property but consented to the establishment of the trust only as a last resort and as an emergency measure pending the sale and liquidation of their investment. The beneficiaries and the trustee agree that the property will be sold when an offer acceptable to two-thirds of the former is received. Both the large certificate holders, such as banks (now in receivership), and the small investors are anxious to liquidate the principal of their investment as soon as possible. They are willing to accept $400,000 for the property. No offer of even 40 percent of the cost to the petitioner has been received.

The trust managers have at all times considered the liquidation of the property as their primary object and have engaged in the active operation of the property only in so far as was necessary to continue the enterprise as a going concern in order to preserve its maximum salability. In so doing, they have hired a manager for the garage and have rented the store rooms and apartments. The principal business of the garage is storage but gas, oil, and other supplies are sold incidentally.

At the hearing and on brief the petitioner contended that it was created for the single purpose of liquidating the properties known as the Broadway-Brompton Buildings; that due to the abnormal national economic situation in 1932 no immediate sale could be made; and that, therefore, the trust managers continued to manage and operate the properties solely in order to keep them in the best salable condition for the purpose of disposing of them as soon as possible.

The respondent relies on *Morrissey* v. *Commissioner*, 296 U. S. 344, and similar cases decided contemporaneously. He argues that the bondholders were not compelled to establish the petitioner trust and that, therefore, they chose to operate a business for profit. He also advances the theory that the trust was created to prevent liquidation rather than to effect it and that since the revenue from the operation of the buildings is producing 4 percent on the original investment, when such revenue increases "the desire to sacrifice the property will cease."

From a consideration of the trust agreement and other facts of record, we are of the opinion and find that petitioner was a liquidating trust, organized for the single purpose of liquidation, and that its activities were all reasonably necessary to, and consistent with, the accomplishment of that purpose.

Respondent points to the activities of the trust in renting the properties and the profits therefrom as indicating a business purpose. The law does not require that in liquidating a property the owner must abandon all ordinary business judgment and sacrifice the property immediately without regard for condition of the market or amount of loss. The liquidation is to be accomplished with reasonable regard for all surrounding circumstances. These circumstances may vary with the type of property and the state of the market. If the activity of the trust or property owner in the interim is only such as a reasonably prudent man would undertake in the preservation of the property or the minimizing of his loss, and is consistent with the primary purpose of liquidation, the owner is not to be penalized for such activity. If, on the other hand, the purpose of liquidation be so obscured by the manifold business activities of the trust that the declared purpose can be said to be lost or abandoned, a very different case is presented. Here, the activities of the trust were all reasonably incident to and consistent with orderly liquidation. The declared purpose was neither obscured nor abandoned and its accomplishment was the primary consideration at all times.

We have carefully considered the recent decisions of the Supreme Court and do not believe they dictate a contrary conclusion. In the *Morrissey* case the Chief Justice was at pains to point out that the trust in question "was not a liquidating trust."

Consequent on the above, it is held that petitioner is taxable as a trust and not as a corporation. See *Dolese & Shepherd Co.*, 30 B. T. A. 1171, and cases there cited.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

TURNER and HILL dissent.