MORTGAGE TRUST CERTIFICATE POOL, BERKS COUNTY TRUST COMPANY ALLEGED SUCCESSOR TRUSTEE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 98207. Promulgated November 15, 1940.

*Albert S. Lisenby, Esq.*, and *Stephen T. Dean, Esq.*, for the petitioner. *Brooks Fullerton, Esq.*, and *Charles L. Orpin, Esq.*, for the respondent.

## OPINION.

MURDOCK: The Commissioner has determined deficiencies for the calendar years 1934 and 1935 and has mailed notice thereof to "Mortgage Trust Certificate Pool, Berks County Trust Company, Successor Trustee, Reading, Pennsylvania." He has done this upon the theory that there was a "Mortgage Trust Certificate Pool" of Reading which

was an association taxable as a corporation separate from Reading during those years. Decision of the question depends upon the facts in this particular case. Although it has not seemed advisable to set forth the various stipulations filed by the parties and the exhibits attached thereto, and although not all of the facts will be mentioned in discussion, nevertheless, all of the facts in the record have been carefully considered.

Reading was one of those national banks which was found to be insolvent and not permitted to open its doors for business after having been closed by the proclamation of the President on March 4, 1933. A conservator was appointed for it on March 18, 1933, and he has been succeeded by receivers. It is still in receivership and will be unable to pay the claims of its depositors in full. Neither the name "Mortgage Trust Certificate Pool" nor any similar name appeared upon the accounts of Reading. The conservator found, however, that 2,043 mortgage trust certificates in the face amount of $1,928,069.73 were outstanding on March 4, 1933, and a number of mortgages and some bonds were listed upon the books of Reading as "Investments securing Mortgage Trust Certificates." The securities at that time and at all times thereafter were insufficient to pay off in full the face amount of the certificates. The conservator, and later the receiver, decided that those investments should be held and liquidated for the special benefit of the certificate holders. No new certificates were ever issued after the closing of the bank and the only changes made in the investments after that event were those incident to and necessary in the economical liquidation of the securities. A liquidating distribution was made on December 18, 1933, and other distributions of principal and income were made from time to time thereafter by the receiver as funds became available. The administration and liquidation of the assets proceeded during the two taxable years under the conservator and the receiver upon orders or instructions from the Court of Common Pleas of Berks County, Pennsylvania. The certificate holders had no voice in the appointment of the conservator or of the receiver. They had no organization and no books or records. Their interests were not identical. They took no part whatsoever in the management of the securities which the conservator and the receiver had taken over for their benefit. The Commissioner, in determining the deficiencies, included in income the entire amount of income received from the securities during the taxable years. He allowed deductions for expenditures shown upon the books of the conservator and the receiver, including interest, taxes, and some other items. He allowed no deduction for losses in connection with about thirteen foreclosures which took place in 1934.

The alleged association which the Commissioner has taxed as a corporation began in March 1933, when the conservator decided to

hold and liquidate certain assets for the benefit of the certificate holders. The receiver of insolvent Reading followed the same policy. Their actions were in some instances directed by the court and in all instances approved by the court. They were acting in a fiduciary capacity for the benefit of the certificate holders. The situation was apparently a receivership, but, whatever it was, it may be regarded as practically the equivalent of a trust for the present purpose of determining whether it was an association taxable as a corporation. The situation bore little, if any, analogy to a corporate organization in form, purpose, or activities. The conservator and the receiver did not intend "to provide a medium for the conduct of a business and sharing its gains." Cf. *Morrissey* v. *Commissioner*, 296 U. S. 344. They never used the assets to carry on any business, but at all times administered them solely for the purpose of liquidation. A liquidating trust is not an association taxable as a corporation. *Fidelity National Bank & Trust Co.*, 37 B. T. A. 473; *Frederick Pitzman et al., Trustees*, 36 B. T. A. 81; *Broadway-Brompton Buildings Liquidation Trust*, 34 B. T. A. 1089; *Girard Trust Co., Trustee*, 34 B. T. A. 1066; *Dolese & Shepherd Co., Syndicate No. 3*, 30 B. T. A. 1171; *Dauphin Deposit & Trust Co., Trustee*, 21 B. T. A. 1214; *Wilson Syndicate Trust*, 14 B. T. A. 508; affd., 39 Fed. (2d) 43. The so-called "Mortgage Trust Certificate Pool" was not an association taxable as a corporation during the years 1934 and 1935.

Both parties have discussed in considerable detail the complete history of the mortgage trust certificates and some discussion herein of that history may not be amiss, although, as has been said above, we are concerned with the situation as it existed during the years 1934 and 1935, after Reading had been closed and when the entire matter was in the hands of the conservator or the receiver of Reading. Reading issued mortgage trust certificates for the first time after its board of directors had adopted a resolution on January 27, 1920, authorizing the issuance of such certificates not to exceed $500,000 in amount, bearing interest at 4 percent. The resolution provided, *inter alia*, that the principal of the certificates would be payable in two years without deduction for expenses or losses incurred in the management of the trust fund. It directed the opening of an account in which should be recorded all receipts of income (including interest, commissions, and profits of every nature from the investments held in trust for the certificate holders), all expenses (including losses), and all changes in the capital account. However, no such account was ever set up on the books of Reading. Reading issued mortgage trust certificates following the adoption of that resolution. They certified that Reading had received a stated amount in trust for the registered owner, which, together with other moneys received by Reading under similar

certificates, it held as a trust fund separate and apart from the assets of the bank in trust for the certificate holders and it would keep the same invested in certain securities. Each certificate stated that it was transferable only on the books of the bank and was payable on a certain day, usually about one year from the date of issuance, with interest at the rate of 4½ percent, "without deduction for the State Tax of four (4) mills or any expenses or losses incurred in the management of the Trust Fund." One hundred and seventy-nine of those certificates in the face amount of $155,270 were still outstanding on March 4, 1933.

The directors of Reading likewise resolved on January 27, 1920, to take over, from the Commercial Trust Co., securities constituting a trust fund for the payment of mortgage trust certificates issued by that company "and Administer the same for the purpose of liquidation." Those certificates were substantially similar to the ones issued by Reading, except that they provided for interest at 4 percent and contained the further statement that the company guaranteed payment of the principal and interest in full. One hundred and twenty-one of those certificates in the face amount of $32,000 were outstanding on March 4, 1933.

Reading authorized the issuance of an increased amount of certificates in 1923 and in 1924 it began issuing a new form of certificate. Those certificates did not contain the provision in regard to the losses which was contained in the earlier form. The change was apparently made to satisfy the Comptroller of the Currency, who had complained that the old form represented a direct obligation of the bank rather than a mere interest in a collection of investments. The new form stated that Reading had received a specified amount in trust, which, together with other moneys received under similar certificates, it held as a trust fund, as defined or referred to by section 11 (k) of the Federal Reserve Act, separate and apart from the assets of the bank, in trust for the holders of the certificates. It also contained the following statement. "The holder further directs that as compensation, for such services rendered, the trustee hereof shall retain all income in excess of 4½ percent." The certificate was payable on a day certain usually about one year after the date of issuance. Three hundred and twenty-five of those certificates, having a face value of $253,140, were outstanding on March 4, 1933.

Reading purchased the assets and assumed the liabilities of the Reading Liberty Bank on March 17, 1925. Some mortgages and other assets securing mortgage participation certificates which had been issued by Liberty were among the properties taken over by Reading. Two of those in the face amount of $3,000 were still outstanding on March 4, 1933. Their form was somewhat different, but since they are relatively unimportant, their differences will not be discussed.

Reading again changed the form of its certificate in January 1927. One change was that the trustee was directed to retain all income in excess of 5 percent. It also provided: "The term of this trust shall expire on the first day of _____, 19____ and this certificate will be liquidated *pro rata* from the proceeds of the trust fund as and when collected." Inserted in the space for a date on each certificate was a date approximately one year after the date upon which the certificate had been issued. One thousand, four hundred and sixteen of those certificates in the face amount of $1,484,659.73 were outstanding on March 4, 1933.

The certificates, 2,043 in number, above described as outstanding on March 4, 1933, were the certificates with which the conservator was concerned and which were outstanding during the two taxable years before the Board. Reading, in handling the five different kinds of certificates, made no distinction between them except for the rate of interest. It did not separately invest and separately account for the outstanding amount of each of the five different types of certificates. Neither did it separately invest or separately account for the outstanding amount of any combination or of all of the different types of certificates. It never purchased any securities as a fiduciary representing any of the certificate holders as beneficial owners. It never maintained any pool of mortgages or investments, the profit or loss and the income of which was accounted for separately as pertaining to any group of certificate holders. It maintained no income or profit and loss records in the name of or on behalf of any pool of securities or group of certificate holders. It filed no income tax returns for any such pool. It did not administer as a separate trust fund the amounts paid in by certificate purchasers.

Reading commingled with its other trust funds the amounts received by it for mortgage trust certificates. It made investments from those commingled funds, some of which it allocated to various trusts of which it was trustee, some of which it sold to customers, some of which it allocated to other so-called mortgage trust pools, and some of which it allocated to "Investments securing Mortgage Trust Certificates." The latter allocation was merely to guarantee that it would pay to the certificate holders the principal amount of their certificates and interest at the specified rate up to the date of redemption. The securities were allocated to that account without any distinction whatsoever between the five different types of certificates which were outstanding. Reading purchased all of those securities with its general trust funds and held them in its own name. It took into the income of its trust department, as its own income, all income from those securities, whether by way of interest, commissions, or profit. All interest paid to certificate holders was charged to expense of the trust department as were other expenditures of that department.

It regularly paid the interest on the certificates and redeemed them as they were presented for payment by paying out funds from its trust department. The resulting profit or loss of the trust department, along with other profit or loss of that department, was entered in Reading's general profit and loss account and was included in its income tax returns as its income. Thus, although it allocated certain investments as security for the mortgage trust certificates, it treated those securities as its own property and not as the separate property of any group of certificate holders. It administered those securities and dealt with them as it chose. It made changes in the list as it saw fit. It took all profits from those securities and simply paid the certificate holders principal and interest. When the income from the securities was insufficient to pay the interest on the certificates, Reading made up the difference from its own funds. It never recognized that the certificate holders were entitled to any income or profit from any particular securities and the certificate holders never received any amount in excess of their principal with interest at the specified rate.

Each certificate holder entered into a separate agreement with Reading, paid his money to Reading, and received the agreement of Reading shown on his certificate. The certificate holders did not join with each other in any single or general contract. They had no organization, no officers, no seal, no name, no books or records, no meetings, and no voice in the management of any securities. In fact, there was no property or income from property which could be identified as the property or income of any group of certificate holders. The certificate holders were never consulted or advised by Reading in regard to the management of any securities, the amount of any securities held by Reading, the income from any securities, the amount of certificates issued or to be issued, or in regard to any other matter pertaining to the management or administration of any securities held by Reading. One form of certificate was different from another form. The maturity dates depended upon the date of purchase of the certificate and, therefore, were different on the various certificates.

There is considerable variance between the resolution of January 27, 1920, and the original form of certificate, between one form of certificate and another, and between the provisions of the resolution and those of the certificates, on the one hand, and the actual practice of Reading in administering and accounting for transactions relating to the investments, on the other. Furthermore, there may be some inconsistency in the provisions of the resolution and also in the provisions of the certificates. Reading might have adopted a practice which would have conformed more nearly to its agreements as evidenced by certificates. But such possibilities have no

particular significance here. We need not decide whether there would have been an association taxable as a corporation had Reading actually created a separate trust fund for each, or some, group of certificate holders. Likewise, we need not decide whether there was an association taxable as a corporation under the practice which Reading actually followed for over thirteen years. A decision is required only for the circumstances as they actually existed during the taxable years.

The Commissioner argues that the certificate holders pooled their resources in a trust, which was to carry on a business for profit, in order to obtain a wider spread for their investments, centralized management, a continuing body, and limitation of risk. He says the certificates, freely transferable, were like stock certificates and that there was a trust which owned and held assets separate from those of Reading. No good purpose would be served by applying this argument to the situation as it might have been or as it was prior to the time that Reading was closed. The situation after Reading was closed has been discussed already. The Commissioner cites as the case nearest on the facts, and as his only authority in support of his contention that there was an association taxable as a corporation, the case of *Fidelity Bankers Trust Co.* v. *Helvering*, 113 Fed. (2d) 14. The opinion in that case is helpful, since it contains an able discussion of the general subject, but it is not controlling here, since the facts in the two cases are so different. The trust in that case was created by a single instrument, a tri-party contract. The subscribers acted jointly in all matters pertaining to the trust. The trust owned its own property and had its own income, within certain limitations. There was an organization with a business name. The trustee had broad powers acting with the approval of the subscribers. It could purchase, sell, lease, rent, and otherwise act in regard to property. The certificates were transferable. It carried on a business. The trust had a definite term. The trust borrowed money. Other differences could be pointed out, but enough has been said to show that the two cases are not much alike. The holding of the court on another point in that case was that money paid by the bank to the certificate holders in accordance with its guarantee of a fixed rate was not income to any intervening organization. However, we need not consider the possible applicability of that part of the opinion to the present controversy.

A study of the entire history of the trust certificates and consideration of the argument and authority cited by the Commissioner casts no doubt upon the reasoning which we used in the beginning of this opinion to reach the conclusion that there was no association taxable as a corporation, at least during the taxable years 1934 and 1935.

*Decision will be entered for the petitioner.*