Cole and Crane Real Estate Trust, Albert H. Cole, H. Langdon Laws, and Charles H. Stephens, Jr., Trustees v. Commissioner.
Cole & Crane Real Estate Trust v. Commissioner
Docket No. 563.
United States Tax Court
1944 Tax Ct. Memo LEXIS 188; 3 T.C.M. (CCH) 658; T.C.M. (RIA) 44258; July 5, 1944
*188 Selden S. McNeer, Esq., First Huntington Nat. Bank Bldg., Huntington, W. Va., for the petitioners. John H. Pigg, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined deficiencies in income tax for the calendar years 1938, 1939, and 1940 in the respective amounts of $27,604.84, $36,406.83, and $67,531.14. The only question for determination is whether the Cole and Crane Real Estate Trust is an association taxable as a corporation under section 901 (a) (2) of the Revenue Act of 1938 and section 3797 (a) (3) of the Internal Revenue Code. Some of the facts have been stipulated. Petitioners filed fiduciary income tax returns for the taxable years with the collector for the first district of Ohio. Findings of Fact The petitioners, Albert H. Cole, H. Langdon Laws, and Charles H. Stephens, Jr., are the present trustees of the Cole and Crane Real Estate Trust, hereinafter referred to as the trust, which was created by a declaration of trust dated December 6, 1916. Prior to the year 1875, James O. Cole of Peru, Indiana, and Clinton Crane of Cincinnati, Ohio, owned a sawmill in Indiana and were engaged in the lumber business *189 in that state. In 1875, the partnership between the two men, which operated under the firm name of C. Crane and Company, installed a sawmill in Cincinnati, Ohio, and engaged in the buying of logs and the manufacture of lumber in that locality. The business was incorporated under the laws of Indiana in 1894 and operated under the same name as the former partnership. In 1914, the corporation transferred all of its property to Cole and Crane as individuals, and in 1915 the corporation was dissolved. Thereafter, the business of manufacturing lumber was conducted by Cole and Crane as equal partners under the name of C. Crane and Company until the death of Crane, which occurred on May 4, 1917. Subsequent to the installation of the sawmill in Cincinnati, Cole and Crane purchased large boundaries of standing timber on the water-sheds of various rivers and creeks above Cincinnati. They had the timber cut into logs, and the logs were floated down the river to Cincinnati where they were manufactured into lumber. During the period from 1875 to 1916, Cole and Crane had acquired in fee over 90,000 acres of timber lands on the watershed of the Guyandotte River, and other water courses tributary *190 to the Ohio River in Wyoming, Logan, Mingo, and Boone Counties in the State of West Virginia, as well as certain boundaries of standing timber, without the fee, in those counties and also in Raleigh County. These were rough mountain timber lands and were generally considered at that time to be of no value except for the timber. Although it was then known that much of the land in that territory was underlined with coal seams, there was little or no coal development in that locality. However, by 1916, coal mining operations were well under way in Logan and Mingo Counties, and to a lesser degree in Boone County. In 1913, Cole and Crane had made a coal mining lease of 25,000 acres of land in Logan County to the Main Island Creek Coal Company. As the timber lands and timber boundaries were acquired, logging and timber operations were conducted thereon, with the result that by 1916 a large part of the timber had been cut and removed, although certain boundaries still remained uncut. Cole and Crane also owned about 170 acres of land in or near the City of Huntington, West Virginia, which had been acquired as a log boom site on the Guyan River, and a number of improved properties in the *191 cities of Huntington and Logan, West. Virginia, and in or near Newport, Kentucky. The Newport properties consisted of small dwellings which had been acquired for the use of employees of Cole and Crane. Although the Huntington and Logan city properties were held by Cole and Crane in fee simple, the conveyances to them were accompanied by options to the vendors to repurchase at stipulated prices. With respect to the boundaries of standing timber, it was provided that Cole and Crane were required to cut and remove the trees within a specified time or such trees would revert to the fee owners of the underlying land. The lumber manufacturing business of C. Crane and Company was regarded by Cole and Crane as separate and apart from their property holdings as hereinbefore mentioned. They regarded these property holdings as held by them in equal undivided interests under the firm name of Cole and Crane. In 1916, Cole was 88 years of age and Crane was 72 years of age. Crane, who was the active partner, was seriously ill. Cole had a wife, a daughter, and four grandchildren who were the children of a deceased son. Crane had a wife and two daughters. These members of the families of Cole and *192 Crane were entirely without business experience. Both Crane and Cole desired to dispose of the lumber manufacturing business known as C. Crane and Company and to leave their landed property holdings in such condition as would best protect their wives and other beneficiaries. They knew that much of their land contained coal seams and was valuable only for the coal deposits and timber. A substantial portion of that land had been leased by them for coal mining purposes. As a practical matter, it is extremely difficult to make advantageous leases of coal lands if the prospective lessee must deal with scattered heirs. Originally, Cole intended to create a trust by will for the holding and ultimate disposition of the West Virginia lands for the benefit of his wife and descendants. However, since the lands were held in undivided interests and each partner resided in a different state, it was thought that there were too many legal difficulties in the way of making joint or related wills. Consequently, upon advice of counsel, they decided to create a trust while living, which, however, was not to become effective until the death of the partner dying first. Thereupon, and pursuant to the plan *193 agreed upon, the West Virginia lands and certain other real estate were conveyed to three trustees, who, contemporaneously therewith, executed a declaration of trust. The deeds and declaration of trust were dated December 6, 1916, and executed the following day. The trust instrument provided that during the term of the joint lives of the settlors, James O. Cole and Clinton Crane, they should have the exclusive possession, use, income, management and control of the trust property free from any control or interference by the trustees, but that "after the death of either the said James O. Cole or the said Clinton Crane, the Trustees shall have the absolute control over and management of all real estate and other property held by them at any time under this trust, including the power to execute any lease or leases of said real estate or any part thereof, for the purpose of boring for oil or gas or for mining coal or other minerals, upon such terms and conditions as to them may seem best, and to receive all rents and royalties thence arising." The trustees were to "hold said property and all income, rents, issues and profits thence derived in trust, one-half undivided thereof for the *194 said James O. Cole, his heirs, personal representatives, devisees, legatees or assigns." The beneficiaries were not to have any legal title to the trust property and "they shall have no right to call for any partition of the trust property." The death of a beneficiary during the continuance of the trust would not terminate the trust nor would it entitle the successors of such beneficiary to an account or to take any action against the trustees, but "the heirs, personal representatives, devisees, legatees or assigns shall succeed to all the rights of the deceased under this trust." It was further provided that no assessment should ever be made upon a beneficiary, that the trustees should have no power to bind the beneficiaries personally, and that "in any order, contract or obligation which the Trustees shall give or enter into, it shall be the duty of the Trustees to refer expressly to this Declaration of Trust and to stipulate that neither the Trustees nor the beneficiaries shall be held to any personal liability under or by reason of such order, contract or obligation." In connection with oil, gas, or mineral leases, the trustees were authorized to execute such leases for a term *195 not exceeding fifty years with the privilege extended to the lessee to renew the lease until all the oil, gas, coal, or other minerals were pumped or mined out. They also were given the power to let any house to rent, to sell any standing timber and receive the purchase price therefor, and to keep in reasonable repair any dwellings on said property. The indenture further provided that the trustees "shall have power to sell orexchange portions of said land or to buy adjoining parcels of land in order to round up or straighten the boundaries and put the lands in better shape for development, or to provide access and approach to said land, or for right-of-way purposes, and to exercise all such other powers and rights as an absolute owner could or might exercise in respect to his own real estate." The trustees were required to see that all of the trust property was properly assessed for taxation and to pay the taxes, and in cases where the lessees agreed to pay the taxes on the leased property, to see that such lessees complied with their agreement. They were also empowered to accumulate from the rents and profits of the trust sufficient funds to pay off any liens against the trust property. *196 Any timber conveyed to the trustees by the settlors was to be sold by the trustees in time to permit the removal of such timber within the time limit for such removal as set forth in the deeds to the settlors. The trustees were required to disburse quarterly, or oftener in their discretion, all surplus or net income from the trust property after setting aside a fund sufficient to meet the expenses of the trust. They were also authorized to open and maintain offices in Cincinnati. The trust indenture also provided as follows: "Fifteenth. The Trustees shall not have power to engage in any mining operation of any kind, either for coal, oil, gas, or other mineral, nor to engage in removing timber or manufacturing lumber on any trust property. Said Trustees may, however, prospect and search for coal on said property with the view of facilitating the leasing thereof." Provision was made for the trustees to employ a mining engineer and other assistants to watch the mines on the trust property and to see that the lessees complied with the provisions of their leases. After the death of either James O. Cole or Clinton Crane, all coal royalties, rents, purchase money for timber and all *197 income from the trust property was to be paid to the trustees and disposed of by them under the terms of the trust agreement. The trustees were given discretionary power to determine which of their receipts and expenditures were to be treated as capital and which as income. Provision was further made that the holders of three-fourths of the beneficial interest in the trust property could at any time remove any trustee. In the event of a vacancy in the office of trustee by death, resignation, removal or otherwise, such vacancy was to be filled by the remaining trustees. The trust was to end twenty years after the death of certain named persons but in no event was it to continue longer than fifty years from the date of the declaration of trust. The trustees were to terminate the trust by conveying all of the trust property then remaining in their hands to the beneficiaries in the proportion of their respective interests; "provided, however, that if at such time, or at any other time after the expiration of fifteen years after the death of the survivor of said James O. Cole and Clinton Crane, the Trustees shall be requested, by an instrument in writing duly signed and acknowledged in *198 the manner required for the acknowledgment of deeds, by the owners of three-fourths of the beneficial interest in said trust property, to sell any or all of said trust property, they shall comply with such request as soon as feasible in their judgment, but at all events within five years, upon such reasonable terms and conditions as they deem just and proper." It was further provided that the "beneficiaries shall have no right in the management or control of the trust property, except as hereinabove stated, and their only right shall be to receive such dividends as the Trustees may declare and pay from time to time, and to share in the net proceeds of any sale of the trust property." On December 27, 1916, Crane executed a will in which he made particular reference to the trust instrument and named his wife and his two daughters, their heirs and assigns as his beneficiaries thereof. On May 26, 1917, Cole executed a codicil to his will in which he referred to the trust instrument and designated his beneficiaries thereof. None of the beneficiaries of Cole and Crane except their respective wives knew of the execution of the declaration of trust or had anything to do with its execution. *199 The trust became effective on May 4, 1917, which was the date of Crane's death, and since that time has been carried on by the trustees pursuant to the declaration of trust. James O. Cole died on February 3, 1923. The original trustees were Albert H. Cole, a great-nephew of James O. Cole, John E. C. Kohlsaat and Charles W. Campbell. Kohlsaat and Campbell have both died and they have been succeeded as trustees by H. Langdon Laws and Charles H. Stephens, Jr. During his entire trusteeship, Albert H. Cole has resided at Peru, Indiana. Kohlsaat originally resided in Cincinnati, Ohio, but subsequently moved to California. Campbell resided in West Virginia. Laws and Stephens are residents of Cincinnati. The beneficiaries have never held any meetings or met with the trustees, or exercised or attempted to exercise any control over the trustees, or done anything in connection with the trust except to receive distributions paid to them by the Trustees. The trustees have never had any officers, except that in the beginning of the trusteeship, Kohlsaat was designated as secretary-treasurer of the trust. Since Kohlsaat's death in 1932, no other secretary-treasurer has been appointed. The trustees *200 have never held any formal meetings, but have from time to time met informally. They have also determined problems in connection with the trust's affairs by correspondence and long-distance telephone calls. The trust has no seal and no by-laws. The trustees have never issued any certificates of beneficial interest, nor does the declaration of trust give them such power. The only records kept by the trustees are such as are necessary to show the receipts and disbursements of the trust, vouchers, copies of income tax returns, names and post office addresses of all of the beneficiaries of the trust, etc. The trustees do not make up operating statements, balance sheets or profit and loss statements. The trustees have never been requested by the owners of three-fourths of the beneficial interest in the trust to sell all or any part of the trust property. Except for the sum of about $60,000 which the trustees have kept in United States bonds for emergency purposes in connection with the trust, they have never reinvested any of the trust funds, nor have they held back anything for depletion reserve, or other similar purpose, but have always distributed all receipts to the beneficiaries *201 currently, except for a sum reserved for taxes and expenses. The trustees make regular monthly distributions of fixed amounts to the beneficiaries and from time to time, usually two or three times a year, they make extra or special distributions of all funds on hand which the trustees do not think are needed for current expenses or contingencies. The total annual expenses of the trust amount to approximately 7 or 8 percent of the gross receipts of the trust. The trustees have maintained an office in Cincinnati. They employ a half-time engineer and his full-time assistant, whose duties are to check on the actual tonnage of coal mined, and to compute from that the amounts of royalties due to the trust. The engineer and his assistant also attempt to see that the lessees comply with the terms of the coal mining leases and that the coal is so mined as to avoid loss and waste of coal. The trustees also employ a bookkeeper-office manager and a stenographer. The trustees have never engaged in the lumber business, the coal mining business, the oil or gas business, or any other business. They have received royalties from the 25,000 acre coal mining lease on Island Creek which was made prior *202 to the creation of the trust, and have received royalties under other coal mining leases made by them. They have tried to see that the trust property has not been wasted, and that the coal therein has not been lost by improper mining methods of the lessees. The trustees have also collected nominal rentals from surface tenants kept on the lands primarily to avoid adverse possession. Upon the date on which the trust became effective which was May 4, 1917, the trustees, carrying out what they understood to be the purpose of the settlors of the trust, established the policy of selling or distributing to the beneficiaries in kind the timber located on land not owned by the trust in fee, and all of the land, both fee and mineral, which did not appear to contain good coal seams or to have good prospects of early development for coal. The trust lands which were already leased for coal mining purposes when the trust was created and trust lands which the trustees believed were underlaid with valuable coal deposits and could probably be leased for coal mining purposes were retained because the lands were only valuable for the coal in them, and the trustees believed that a much higher price *203 could be secured by selling the coal by means of coal mining leases rather than by selling the land as a whole. As a result of this policy, the following trust properties have been disposed of by the trustees prior to January 1, 1941: [SEE TABLE IN ORIGINAL] After the above-described transactions, the only lands owned by the trust during the taxable years were 27,900 acres of land in Logan County, 5,613 acres of land in Mingo County and 6,700 acres of land in Boone County. Most of the timber on these lands had been sold by the settlors to the Island Creek Lumber Company, under an agreement dated August 25, 1913, whereby the timber was to be paid for as cut. This agreement was assigned by that company to the Peytona Lumber Company, on March 31, 1916. Pursuant to that agreement, those companies entered upon said lands and cut the timber and paid for it as cut. Payments therefor were made by the Peytona Lumber Company to the trustees for the timber cut by it from the effective date of the trust until 1928. Smaller quantities of the timber on these lands were sold by the trustees, in like manner, to the Northeast Lumber Company and payments therefor were made to the trustees, during *204 the years 1930 to 1933, inclusive. Still smaller amounts of said timber were similarly sold by the trustees to other lumber operators. All of the proceeds from the sale of such timber was distributed as received by the trustees to the beneficiaries. The timber on about 2,300 acres of land on Rich Creek, in Logan County, and on about 1,500 acres of land on Hunter's Branch, in Boone County, has not been sold. These areas are not heavily timbered and the timber now growing thereon is second growth. For the purpose of gaining access to certain of the above-described Mingo County lands and to put such lands in better shape for development, the trustees, at an undisclosed time, purchased approximately 160 acres of adjoining lands in fee, and 60 acres of mineral rights in lands in said county. In order to effect the sale, on April 1, 1919, to the Youghiogheny & Ohio Coal Company, of a portion of the abovedescribed Boone County lands, the trustees, for the purpose of rounding out and straightening boundaries, and providing access and approach to certain of said lands, and for rights-of-way purposes, purchased approximately 1,300 acres of adjoining lands in fee, 390 acres of mineral lands *205 and 160 acres of surface lands. Except for such acquisitions by the trustees, they could not have advantageously disposed of this portion of the Boone County lands. By reason thereof, they were enabled to obtain what they considered an advantageous price for the lands sold. The remaining two parcels of lands in Boone County, consisting of approximately 3,400 acres, were under lease at one time, but the leases were abandoned by the lessees. The trustees have not been able to get other tenants or lessees, or to make any advantageous sale of these two parcels. As to the remaining Mingo County lands, not now under lease, the trustees have not been able thus far to either sell or lease such land, but think that they will be able to do so in the near future. The sales by the trustees of the Wyoming, Mingo and Boone County lands, as hereinabove set forth, were made because those lands were not regarded by the trustees as having good prospects for early coal development. For that reason, such sales were regarded by the trustees as for the best interests of the trust and its beneficiaries. It was the purpose of the trustees to either dispose of the land outright or to dispose of the coal through *206 leases, whichever would be most advantageous to the trust and its beneficiaries. The lease of October 6, 1913, covering the 25,000 acres of Logan County land, as above set forth, was for a term of fifty years from and after January 1, 1914, with option to the lessee for the renewal thereof for a like term of fifty years, if all the merchantable and minable coal was not mined and removed from the leased premises during the original term. Likewise, the lease of July 19, 1917, given by the trustees to the Mordue Collieries Company; the lease of September 1, 1920, given by the trustees to W. J. Pritchard; and the lease of November 28, 1922, given by the trustees to the Island Creek Coal Company, were each for a term of fifty years, with like options to the respective lessees for the renewal thereof for a like term of fifty years. Whenever they could, the trustees have leased the trust lands for gas and oil and have granted some rights-of-way for power lines and gas lines, for which they received small considerations. Under the terms of each of the leases hereinabove referred to, the lessee is required to pay all taxes that may be assessed against the leased premises and any improvements *207 thereon, and upon the coal mined and the coke manufactured during the continuance of the respective leases. The trustees see to it that the lessees pay such taxes according to the terms of their leases. In some cases, after the leases were executed, the trustees shared with the lessees the expense of putting down bore holes to ascertain the seams of coal under the ground. Certain modifications of the provisions of the lease of October 6, 1913, as originally executed by the settlors, have been agreed to by the trustees. The original lessee, the Main Island Creek Coal Company, got into financial difficulties, as a result of which the lease was transferred to the Hutchinson Island Coal Company in 1924. The lease was shortly thereafter transferred to the West Virginia Coal & Coke Company, which Company went through a receivership, and in about the year 1929 was reorganized under the name of West Virginia Coal & Coke Corporation, the present lessee. At the time the West Virginia Coal & Coke Company succeeded to the rights and property of the original lessee, in 1924, there was a reduction of the specified rentals and of the royalties on certain grades of coal. There was a further reduction *208 in such rentals and royalties in 1929. These modifications were agreed to by the trustees because the operating lessee insisted that it could not pay the rentals and royalties as originally provided for, and meet the competition of other producers. The trustees considered their agreements to these modifications as the exercise of good business judgment because they did not want to get back the coal properties since under the terms of the declaration of trust, they would be unable to operate such properties in their capacities as trustees. Prior to the death of Crane, on May 4, 1917, the settlors had ascertained that the abovedescribed 3,300 acre tract of Boone County land could not be leased unless an outlet through railroad facilities was provided. Prior to that time the settlors had carried on negotiations with certain persons looking toward the leasing of this tract of land for coal mining purposes, and in that connection they had made an agreement with the Chesapeake & Ohio Railway Company for the construction of a railroad track connecting the property with that company's main line. The settlors were to furnish the right-of-way and certain materials and were to perform a specified *209 part of the construction work. The balance of the materials and construction work were to be furnished and performed by the railway company. Upon completion, the right-of-way and connecting track were to be conveyed to the railway company to be operated as a common carrier. These negotiations were continued by the trustees after Crane's death. The trustees considered that they were not authorized under the trust agreement to do or perform work of the kind necessary to the construction of such railroad track, and unsuccessfully endeavored to get the prospective lessees, with whom the settlors had theretofore been negotiating, to assume the obligation to perform the settlors' part of the tract with the railway company. These negotiations culminated in the execution by the trustees of the lease of July 19, 1917, in favor of the Mordue Collieries Company, under an agreement or arrangement whereby the trustees were to contribute one-fourth of the cost of construction of the necessary connecting railroad track, the construction thereof to be performed by the lessee company. In discharge of this obligation, the trustees paid to the Mordue Collieriescompany the sum of $30,549.95. Upon completion, *210 the connecting track, including the right-of-way, was conveyed by the trustees to the railway company. The following amounts have been distributed by the trustees to the beneficiaries: Year
Amount
1917
$ 49,726.18
1918
158,074.40
1919
604,000.00
1920
396,000.00
1921
225,842.54
1922
1,132,000.00
1923
879,098.71
1924
292,000.00
1925
216,000.00
1926
360,000.00
1927
378,000.00
1928
216,000.00
1929
360,000.00
1930
288,000.00
1931
240,000.00
1932
216,000.00
1933
156,000.00
1934
192,000.00
1935
228,000.00
1936
288,000.00
1937
276,000.00
1938
192,000.00
1939
276,000.00
1940
360,000.00
Total
$7,978,741.83
The settlors considered their lumber manufacturing business, known as C. Crane and Company, a hazardous enterprise. This business was entirely separate from the landed property holdings of the settlors. Prior to their deaths, both of the settlors expressed a desire that the business of the C. Crane and Company be sold or closed out during their lifetime or as soon thereafter as possible. Crane in his will empowered his executors to continue the C. Crane and Company business but he further provided that "the foregoing powers shall not apply to my beneficial *211 interest in certain real estate in West Virginia and Kentucky heretofore deeded in trust * * *." The properties transferred by the settlors to the trust represented approximately threefourths of their respective estates. Upon the death of James O. Cole, and that of his grandson, Samuel Cole, the West Virginia inheritance tax was paid to the tax commissioner of that state in respect of the interests of those decedents in the trust estate. On or about November 10, 1943, petitioners filed with respondent a waiver of restrictions on the assessment and collection of the deficiencies involved in this proceeding, on the face of which was contained the following statement: "By signing this waiver we do not admit liability for any of the taxes mentioned above, but expressly deny all such liability for the reasons set forth in our petition heretofore filed with The Tax Court of the United States in our case now pending in said court, being docket No. 563; and we will ask said court to find that all payments made by us pursuant to this waiver are overpayments and should be refunded to us, with interest." After the filing of said waiver and on December 20, 1943, petitioners paid to respondent *212 the amount of the deficiencies plus interest in the sum of $157,926.28. The beneficiaries of the trust did not plan a common effort or enter into a combination for the conduct of a business enterprise. They did not associate themeselves and were never voluntarily associated for such purpose. The trust is and has always been a strict or pure trust. Opinion The sole question invlved in this proceeding is whether the trust known as the Cole and Crane Real Estate Trust is a strict or pure trust, or an association taxable as a corporation under section 901 (a) (2) of the Revenue Act of 1938, and section 3797 (a) (3) of the Internal Revenue Code. These sections provide that "the term 'corporation' includes associations, joint-stock companies, and insurance companies." The respondent has determined the deficiencies for the taxable years upon the ground that the trust was taxable as an association. Petitioners contend that the trust is a pure trust and not an association since it was not formed by the voluntary association of the beneficiaries and was not created for the purpose of carrying on a business enterprise for its gains. They argue that the trust was a testamentary or ancestral *213 type of trust created for the conservation and liquidation of the trust property for the benefit and protection of the families of the settlors. Respondent contends that the trust is a business trust and that in its essential features it resembles a corporation since (1) title was taken in the trustees as a continuing body with provision for succession; (2) management and control were centralized in the trustees; (3) the death of a beneficial owner did not cause any termination or interruption of the operation of the trust; (4) provision was made for the transfer of beneficial interests without affecting the continuity of the trust; and (5) there was no personal liability on the trust beneficiaries. Both parties rely upon Morrissey v. Commissioner, 296 U.S. 344, in support of their respective contentions. In that case, it was held that the term "association" implies associates, who enter into a joint enterprise for the transaction of business and the sharing of its gains. It differs from a pure trust in that its object is not to hold and conserve particular property with incidental powers in the trustee, but to provide a medium for the conduct of *214 a business. The court pointed out that the beneficiaries of a pure trust do not as cestuis que trustent plan a common effort or enter into a combination for the conduct of a business enterprise. It was also pointed out that the principal additional characteristics of an association are (1) the vesting in the trustees of title to the property embarked in the enterprise; (2) designation of the trustees as a continuing body; (3) centralized management; (4) security of the enterprise from termination or interruption by the death of the owners of the beneficial interests; (5) transfer of beneficial interests without affecting the continuity of the enterprise, and the introduction of a large number of participants; and (6) limitation of the personal liability of the participants to the property embarked in the undertaking. See also, Swanson v. Commissioner, 296 U.S. 362; Helvering v. Combs, 296 U.S. 365; Helvering v. Coleman-Gilbert Associates, 296 U.S. 369; Lewis & Co. v. Commissioner, 301 U.S. 385. These additional characteristics, however, were emphasized *215 by the Supreme Court not as holding that all trusts which have these characteristics are associations, but as explaining the ease with which the trust form can be used by associates in forming an enterprise for the transaction of business for profit, and as justifying the subordination of form to substance in such cases. The salient question in this case is whether there was a voluntary association of the beneficiaries and owners of the trust property in a joint enterprise for the transaction of business for profit. The answer is found in the facts. Cole who was 88 years of age and Crane who was 72 years of age were nearing the end of their lives. Their property holdings in West Virginia and Kentucky were for the most part mountainous lands valuable only for their coal deposits and timber. They were fully conscious that arrangements would have to be made for the conservation and ultimate disposition of their property after their deaths. They each had accumulated substantial fortunes. Their only concern was to provide for the welfare of their families who were inexperienced in business affairs. They had originally decided to leave their property in trust by will but this was not considered *216 advisable since they resided in different states. However, they accomplished the same result by conveying their properties to a trust and integrating the trust with their wills, the trust to become effective only after one of them had died. Under these facts, it cannot be said that the trust was formed by the voluntary association of the beneficiaries. Since the trust became effective upon the death of the settlor dying first, obviously both Cole and Crane could not be beneficiaries. The facts are also clear that neither Cole nor Crane created the trust for his own benefit. Until the death of either settlor, the beneficiaries of the trust were unknown. As a matter of fact, only the respective wives knew of the execution of the trust and for the most part they were unfamiliar with the details of the trust. Under these circumstances, there was no association employed to carry on a business venture. United States v. Davidson, 115 Fed. (2d) 799. We think the trust was in the nature of a testamentary trust with the donative element being paramount in the minds of the settlors. It was created as part of a testamentary plan to provide for the settlors' beneficiaries. *217 These beneficiaries did not as mere cestuis que trustent plan a common effort or enter into a combination for the conduct of a business enterprise. Morrissey v. Commissioner, supra;Living Funded Trust of Harry E. Lyman, 36 B.T.A. 161. The record is also clear that the trust was not engaged in business for profit. Its activities were directed toward the conservation and ultimate liquidation of the trust properties. The trustees did no more than hold and attempt to preserve the trust property pending complete liquidation, and receive the ordinary fruits arising from its ownership. Such activity does not constitute doing business. Cleveland Trust Co. v. Commissioner, 115 Fed. (2d) 481, certiorari denied, 312 U.S. 704; Commissioner v. Gibbs-Preyer Trusts Nos. 1 & 2, 117 Fed. (2d) 619. The trust consisted principally of properties which had no ready market value and which could only be sold or leased at infrequent intervals. After the trust became effective, the trustees commenced a policy of prompt liquidation of those assets which *218 could be liquidated, and prior to 1923 had distributed many of the assets in kind to the beneficiaries or had sold them and distributed the proceeds. The trustees had sold all the timber standing on land not owned in fee by them, a large tract of coal land in Boone County, 50,000 acres of coal and timber lands in Wyoming County, and various other city properties. After 1923, the only land remaining in the trust consisted of mountain land, which was either leased or held for lease or sale. It may well be that the sale of this property could have been accelerated by a radical reduction in the sale price, but as pointed out in Frederick Pitzman, Trustee, 36 B.T.A. 81, the law does not require the trustees to sacrifice property in order to hurriedly complete liquidation. See also, Girard Trust Co., Trustee, 34 B.T.A. 1066; and Broadway-Brompton Buildings Liquidation Trust, 34 B.T.A. 1089. It should also be noted that under the declaration of trust, the trustees were prohibited from engaging in any mining operation or in removing timber or manufacturing lumber. Under these circumstances, they *219 had no alternative but to sell or lease the lands. The lessees of the lands and not the trust were the entities which engaged in economic activity for profit. Hugh MacRae Land Trust, 1 T.C. 899. It is also significant that the trustees were not empowered to invest any of the trust income or proceeds from the sale of trust property but were required to distribute all receipts to the beneficiaries quarterly after they had set aside a fund sufficient to pay taxes and other expenses. Cf. Helvering v. Washburn, 99 Fed. (2d) 478; Paine v. United States, 32 Fed. Supp. 672; and Frederick Pitzman, Trustee, supra. Respondent emphasizes the fact that the trustees made certain purchases of land and that they also contributed trust funds as part of the cost of constructing a spur track to coal lands belonging to the trust. He also points out that the leases made by the trustees to the lessees were fifty year leases with option to renew in the lessees if all the minable coal was not extracted during the term of the first lease. However, the evidence is unrefuted that *220 the purchases of additional land by the trustees were made for the purposes of rounding out and straightening boundaries and for providing access and approach to other lands owned by the trust. In this connection, respondent has conceded that with respect to the sale of approximately 6,500 acres of Boone County fee lands to the Youghiogheny & Ohio Coal Company in 1919, "this land could not have been advantageously disposed of except for the acquisitions made by the trustees." Similiarly, the contribution by the trustees of approximately $30,000 toward the construction of the spur track was to provide railway facilities for certain coal lands and such contribution was necessary if such lands were to be advantageously leased. The length of the leases was necessary because of the extensiveness of the coal deposits and the length of time which would be required to remove the coal. We are unable to find in these activities of the trustees any indication that they were conducting a business for profit. On the contrary, these activities show a purpose of liquidation of the property by means of wasting leases. The purchases of additional land and the contribution toward the cost of the spur *221 track were only incidental to such liquidation. Cf. Frederick Pitzman, Trustee, supra;Hugh MacRae Land Trust, supra; United States v. Davidson supra. The fact that the liquidation may extend over a long period of time is immaterial. Cf. Helvering v. Washburn, supra;Paine v. United States, supra;Frederick Pitzman, Trustee, supra; and Hugh MacRae Land Trust, supra.See also, Dauphin Deposits Trust Co., Trustee, 21 B.T.A. 1214; Girard Trust Co., Trustee, supra;Broadway-Brompton Buildings Liquidation Trust, supra. Accordingly, it is held that the trust is not an association taxable as a corporation. Since petitioners paid the deficiencies under the circumstances set forth in the findings of fact, there has been an overpayment of tax. Decision will be entered under Rule 50.